UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID D BATTLE JR.
David Battle TTEE

Petitioners,

V.

TRUIST FINANCIAL CORPORATION, D/B/A SUNTRUST; INFINITI OF GWINNETT; BELL & WILLIAMS ASSOCIATES, INC.; JEFFERY FLETCHER, INDIVIDUALLY; XTREME TOWING & RECOVERY, LLC; FLORIDA DEPARTMENT OF HIGHWAY SAFETY AND MOTOR CARS; EQUIFAX INFORMATION SERVICES, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; AND TRANS UNION LLC

Respondents

OCT 9 2026 PM12:32
FILED - USDC - FLMD - TPA

CASE NO. 8:26-CV-3076-MSS-LSG

## BILL IN EQUITY AND FORMAL COMPLAINT

**Petitioner Requests Trial by the Court Sitting in Equity; Rights to Trial by Jury on Legal Claims Expressly Reserved**

## I. INTRODUCTION

1. Petitioners DAVID D. BATTLE, JR. and DAVID BATTLE, Trustee of Hong Sau Living Trust, bring this action against the above-named Respondents for fraud in the origination of a retail installment contract, wrongful repossession using a void Power of Attorney, wrongful title transfer, commercially unreasonable sale, and refusal to validate the alleged obligation. Despite Petitioner's good faith efforts to resolve these disputes through the CFPB, the



TFP

OCC, the North Carolina Commissioner of Banks, the Florida Department of Agriculture, and the American Arbitration Association, Respondents refused to identify the true holder of the note, repossessed and sold Petitioner's car without lawful authority, and pursued a deficiency claim on a debt never properly validated.

2. This action seeks equitable rescission, constructive trust, equitable accounting, and specific performance as primary relief, and compensatory and statutory damages and declaratory and injunctive relief as secondary relief. The equitable claims are independent and are not bounded by statutory limitations periods where Respondents' fraudulent concealment prevented timely discovery.

## II. NATURE OF THE ACTION

3. This action arises primarily in equity and secondarily at law. Petitioner brings equitable claims for rescission of a fraudulently induced transaction, imposition of a constructive trust over all proceeds derived from Petitioner's instrument, equitable accounting, and specific performance of Respondents' obligations to validate the alleged obligation and identify the true holder of the note. These equitable claims are independent of and broader than the statutory claims and are not bounded by statutory limitations periods where Respondents' fraudulent concealment prevented timely discovery.

4. Petitioner brings the following federal claims: violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.; the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.; the Truth in Lending Act, 15 U.S.C. § 1601 et seq., raised

in recoupment pursuant to Beach v. Ocwen Federal Bank, 523 U.S. 410 (1998); the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1964; and 42 U.S.C. § 1983 for deprivation of property without due process of law by a state actor.

5. Petitioner brings the following state law claims: wrongful repossession and breach of peace under Florida UCC Article 9, Fla. Stat. §§ 679.609 and 679.625; commercially unreasonable sale and unlawful deficiency under Fla. Stat. §§ 679.626 and 679.627; violations of the Florida Consumer Collection Practices Act, Fla. Stat. § 559.55 et seq.; Florida civil theft under Fla. Stat. § 772.11; conversion, fraud in the inducement, unjust enrichment, defamation, invasion of privacy, and intentional infliction of emotional distress under Florida common law; violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-501.213; wrongful title transfer under Fla. Stat. §§ 319.22 and 319.28; replevin and monetary equivalent under Fla. Stat. §§ 78.01 and 78.19; insurance licensing violations under Fla. Stat. § 626.112; and a tort claim against FDHSMV under Fla. Stat. § 768.28.

## III. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over Petitioner's federal claims arising under the FDCPA, FCRA, TILA, RICO, and 42 U.S.C. § 1983, and has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and equitable relief including rescission, constructive trust, disgorgement, and accounting.

7. This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same nucleus of operative facts.

8. Venue is proper in the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391(b)(2) because the wrongful repossession occurred at Petitioner's private property in Brooksville, Florida, and the harm to Petitioner's credit and finances occurred in this District.

9. Personal jurisdiction is proper over all Respondents pursuant to Fla. Stat. § 48.193 because each transacted business in Florida or is domiciled in Florida.

10. Petitioner filed a timely tort claim against **FDHSMV** under Florida Statute § 768.28. More than 180 days have elapsed without resolution, and Petitioner is now authorized to file this action.

## IV. PARTIES

11. Petitioner, DAVID D. BATTLE, JR., is a private man domiciled at Brooksville, Florida [34601]. At all relevant times, Petitioner acted in a private, non-commercial capacity as the purchaser in the Retail Installment Sales Contract at issue.

12. Petitioner, DAVID BATTLE, Trustee of Hong Sau Living Trust ('Trustee'), is domiciled in Brooksville, Florida. The Trustee holds a recorded security interest in the Retail Installment Contract as evidenced by a UCC Financing Statement.

13. Respondent **TRUIST FINANCIAL CORPORATION**, doing business as **SunTrust** ('**Truist**'), is a North Carolina corporation with its principal place of

business at 214 North Tryon Street, Charlotte, North Carolina 28202. **Truist** acted at all relevant times as a financial institution, assignee, debt servicer, furnisher of credit information under 15 U.S.C. § 1681s-2.

14. Respondent **INFINITI OF GWINNETT** ('**Dealership**') maintains its principal place of business at 3090 Satellite Blvd, Duluth, Georgia 30096. The **Dealership** is the true originator of the Retail Installment Sales Contract and assigned it to Truist.

15. Respondent **BELL & WILLIAMS ASSOCIATES, INC**. ('**BWA**') maintains its principal place of business at 7 Wall Street, Windham, New Hampshire 03087. **BWA** acted as a debt collector under 15 U.S.C. § 1692a(6) and as a participant in the wrongful taking of Petitioner's car.

16. Respondent **JEFFERY FLETCHER** ('**Fletcher**') is an individual residing at 13262 Spruce Grouse Ave, Brooksville, FL 34614 acted as a debt collector who participated in the repossession of Petitioner's car.

17. Respondent **XTREME TOWING & RECOVERY, LLC** ('**Xtreme Towing**') maintains its principal place of business 6252 Commercial Way #101, Weeki Wachee, FL 34613 and acted as a debt collector conducting the physical repossession of Petitioner's car.

18. Respondent **FLORIDA DEPARTMENT OF HIGHWAY SAFETY AND MOTOR CARS** ('**FDHSMV**') maintains its principal place of business at 2900 Apalachee Parkway, Tallahassee, Florida 32399. Petitioner filed a timely tort

claim under Florida Statute § 768.28, which has not been resolved after more than 180 days.

19. Respondent **EQUIFAX INFORMATION SERVICES, LLC** ('**Equifax**') is headquartered in Georgia and does business in Florida through its registered agent. **Equifax** is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f).

20. Respondent **EXPERIAN INFORMATION SOLUTIONS, INC.** ('**Experian**') is headquartered in California and does business in Florida through its registered agent. **Experian** is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f).

21. Respondent **TRANS UNION LLC** ('**TransUnion**') is headquartered in Illinois and does business in Florida through its registered agent. **TransUnion** is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f).

22. Each Respondent acted as an agent, alter ego, affiliate, co-conspirator, or joint venturer of the others, and each is jointly and severally liable for the acts, omissions, and damages alleged herein.

## V. FACTUAL ALLEGATIONS

### A. The Fraudulent Transaction at the Dealership

23. On or about February 22, 2020, Petitioner traveled by air from Tampa, Florida to Atlanta, Georgia, and then by ground transportation to the **Dealership** in Duluth, Georgia, for the purpose of purchasing a 2019 Infiniti Q50 Red Sport that he had discussed with a sales representative prior to arrival.

24. Upon arrival, Petitioner was informed that the **Dealership** would not honor the price previously discussed, placing Petitioner in an immediate position of economic duress. Having traveled eight hours from his home without a return flight, Petitioner had no reasonable alternative but to proceed with the transaction or face stranded circumstances. The **Dealership's** representatives were aware of Petitioner's circumstances and exploited them.

25. The **Dealership** marketed the car and sold to Petitioner as a Certified Pre-Owned ('CPO') car. The CPO designation came with a manufacturer warranty that was represented to Petitioner as included in the purchase.

26. The **Dealership** presented the Retail Installment Sales Contract ('RIC') to Petitioner via an electronic iPad device. Petitioner attempted to review the documents prior to signing but was repeatedly urged by the Finance Director and sales representatives to proceed with signing. Petitioner was told he would receive a copy to review later. The circumstances did not permit meaningful review of the contract terms before signing. The **Dealership's** signature on the contract consists of an illegible mark identified only as "BM," with no legible name identifying the signatory or their authority to bind the **Dealership**.

27. Petitioner subsequently discovered, after consulting with a legal advisor in 2024, several material discrepancies and fraudulent omissions in the transaction documents, including but not limited to the following:

a. The **Dealership** advertised the purchase price of the car at $34,988.00. The Total Sales Price in the contract was $49,972.44, a discrepancy of nearly $15,000 that was never disclosed or explained.

b. Florida sales tax at the applicable rate of 6.0% on $34,988.00 totals $2,099.28, but the **Dealership** charged the Petitioner $2,345.00, an overcharge of $245.72.

c. The **Dealership** charged the Petitioner an additional $2,980.00 for warranty coverage that was supposed to be included in the advertised car price of $34,988.00 as a CPO car;

d. The **Dealership** did not inform the Petitioner that they would use his signed promissory note to immediately pay off its own floor plan financing for the car, receiving full value from Petitioner's instrument at the moment of signing while Petitioner received no equivalent consideration.

e. The **Dealership** did not inform the Petitioner that they would immediately assign the contract to **Truist** and **Truist** would securitize, pool, and sell the note into an asset-backed securities trust for profit, while continuing to collect payments from Petitioner without beneficial ownership.

f. The **Dealership** did not inform Petitioner that his credit application had independent commercial value or that it would be submitted simultaneously to multiple competing lenders for dealer rate shopping purposes, generating commercial benefit for the **Dealership** from Petitioner's personal financial information without Petitioner's knowledge or consent.

g. The **Dealership** placed multiple insurance products on the car and the note, including products designed to protect the lender in the event of default, without full disclosure to Petitioner.

h. The **Dealership** inaccurately shared the TILA disclosures with overstated values for the Amount Financed due to the warranty charge that should have been included with a CPO car designation, an excess of sales tax, and undisclosed insurance premiums.

28. The **Dealership** employees presented and collected payment for the warranty and insurance products, but held no such license issued by the Florida Department of Financial Services.

29. **Truist** nor **SunTrust** signed the Retail Installment Sales Contract. Petitioner never applied for credit directly from **Truist**, and never negotiated any terms with **Truist**.

30. After purchase, Petitioner brought the car to a local Infiniti dealership due to dark exhaust emissions. It was discovered that modifications made to the car by the previous owner had damaged one of the turbochargers. These modifications and their effects were material defects that were not disclosed at the time of sale by the **Dealership**. While the warranty ultimately covered the majority of repair costs after Petitioner disputed the local dealership's attempt to blame him, Petitioner was still required to pay approximately $500.00 out of pocket for damage caused

by an undisclosed prior modification on a car that was supposed to be a Certified Pre-Owned.

**B. The Securitization and Denial of Instruments**

31. At all times, **Truist** is registered as an asset-backed securitizer and a security-based swap dealer confirmed by its publicly filed Form ABS-15G (Rule 15Ga-1) and SBSE-A reports with the SEC.

32. **Truist** participated in credit derivative markets including credit default swaps, transferring the credit risk of the Petitioner's obligations to a third party without a traditional assignment. **Truist** securitized and transferred the beneficial interest in Petitioner's Retail Installment Contract to a third-party asset-backed securities trust, yet continued to collect payments from Petitioner as if it remained the true holder and beneficial owner of the obligation. Petitioner made written demands for documentation establishing **Truist's** standing and its chain of title, **Truist** refused to provide any such documentation.

33. In 2024, upon learning of the securitization of his account, Petitioner tendered multiple negotiable instruments to **Truist** in an attempt to satisfy the alleged obligation. **Truist** rejected these instruments by letter dated May 22, 2024.

34. **Truist** refused to return the instruments or credit the Petitioner's account.

35. Petitioner made timely written demands for debt validation, a full accounting of all payments and credits, identification of the true holder of the note, proof of

consideration, and production of all relevant agreements. **Truist** refused to provide the accounting and all other requested information.

36. **Truist's** Client Resolution Specialist sent a letter dated April 4, 2025 with **Truist's** formal written denial of all of Petitioner's claims and confirms that the dispute remained unresolved through the regulatory process.

37. During AAA arbitration proceedings styled David Battle v. Nissan Motor Acceptance Company, LLC, Case No. 01-24-0005-8237, Truist argued it was not a party to the arbitration agreement and obtained its removal from the proceeding on that basis. The AAA formally directed Petitioner to pursue this matter in court following the administrative closure of the proceedings since the **Dealership** failed to respond to or participate in the arbitration demand.

**B-1. Failure of Consideration and Invalid Attachment**

38. **Truist** was not a party to the original Retail Installment Sales Contract. **Truist** acquired its claimed interest solely through assignment from the **Dealership** and never executed any agreement directly with Petitioner.

39. **Truist** nor the **Dealership** gave any value to Petitioner in any part of the transaction. **Truist** acted as the assignee only and paid the **Dealership** for the right to collect from Petitioner, giving the Petitioner no cash advance, check, wire transfer, or any other direct tender of funds required for a purchase money loan.

40. The **Dealership** did not give the Petitioner the car as an unencumbered consideration. At the moment Petitioner signed the RISC, the **Dealership**

received full value from the Petitioner. The **Dealership** used the Petitioner's signed promissory note to immediately extinguish the **Dealership's** own floor plan financing obligation on the car and assigned that security interest to **Truist**. The **Dealership** never transferred the car to the Petitioner free of the **Dealership's** continuing legal interest, only conditional possession. The **Dealership** and **Truist** received the full economic benefit of Petitioner's promissory note. Petitioner received no equivalent consideration. Petitioner was left without unencumbered ownership of the car and without the return of his promissory note.

41. The Petitioner performed a UCC Search in Florida and Georgia. Neither the **Dealership** nor **Truist** filed a UCC financing statement at any point relevant to this transaction. Petitioner filed his own UCC Financing Statement in Florida in March 2024, which is the only UCC filing of record in connection with this transaction and placed the public on notice of Petitioner's claimed interest.

42. In addition to refusing to identify the true holder of the note and refusing to provide an authenticated accounting, **Truist** refused to demonstrate that insurance proceeds were properly credited to Petitioner's account before calculating any deficiency, and refused to produce the original signed contract or documentation establishing its chain of title from the **Dealership.**

**C. The Fraudulent Power of Attorney**

43. The POA presented to Petitioner by the **Dealership** at the time of purchase in February 2020 was not completed in its entirety. The document bears only a

signature and car information; the name of the person or entity receiving the power of attorney is left blank; no title number appears; the document is not notarized; no second witness signature appears; and no odometer reading appears.

44. Petitioner did not discover these facial defects until 2024, at which time he immediately revoked all power of attorney purportedly granted to the **Dealership** and to **Truist** via written notice delivered by certified mail, and separately sent a copy of that revocation to **FDHSMV**.

45. The **Dealership** used this defective Power of Attorney to forcibly register the car with the **FDHSMV** without Petitioner's informed consent, and to pay the registration fees associated therewith, without disclosing to Petitioner that this registration would subject the car to **FDHSMV** jurisdiction and administrative control. That forced registration gave **FDHSMV** purported authority over the car and laid the groundwork for the subsequent unlawful title transfer upon repossession. Registration was the Petitioner's contractual obligation. The **Dealership** then registered the car as a commercial vehicle instead of private car causing extra taxes to be paid. The car was never used in commerce.

46. **Truist** used the void Power of Attorney to authorize the repossession and title transfer.

**E. The Wrongful Repossession and Breach of Peace**

47. The Retail Installment Sales Contract provided by The **Dealership**, contains the following language in its arbitration provision: *"Neither you nor we waive the right to arbitrate by using self-help remedies, such as repossession, or by filing an action to recover the car, to recover a deficiency balance, or for individual injunctive relief."* **Truist** relied on this self-help repossession method for taking Petitioner's car without a court order and they refused to participate in the arbitration proceedings as the contract directed.

48. In May 2024, **Truist** directed **Bell & Williams Associates** to locate Petitioner's car and instructed **Xtreme Towing** and **Jeffery Fletcher** to repossess it.

49. On the first occasion, **Jeffery Fletcher** arrived at Petitioner's private property. Petitioner informed **Fletcher** that this was a civil dispute and instructed him not to return; multiple witnesses were present. **Fletcher** remained on the property for approximately one hour, photographed Petitioner and his family without consent, and threatened to take the car. Petitioner instructed **Fletcher** to leave the property and never return.

50. On the second occasion, on Mother's Day 2024, **Fletcher** returned to the property without consent and took the car. While doing so, **Fletcher** told a bystander that Petitioner was a "Sovereign Citizen" who was having his car repossessed. This statement was defamatory and shared the Petitioner's private financial affairs. It exposed the Petitioner to contempt and ridicule, and violated Petitioner's privacy and breached the peace.

51. After the car was taken, **Xtreme Towing** stored the car and required Petitioner to pay a fee to retrieve his personal property from the car. **Xtreme Towing** additionally required Petitioner to surrender the car key as a condition for the Petitioner to retrieve his personal items.

52. Petitioner filed a complaint with the Florida Department of Agriculture and Consumer Services regarding **Xtreme Towing's** conduct. In response, **Fletcher** told the FDACS, the county, and the Sheriff's Office that Petitioner was a "Sovereign Citizen" and falsely claimed Petitioner had driven the car off a tow lift during the first repossession attempt. The 2019 Infiniti Q50 is an extremely low-profile performance car. Driving it off a tow lift at the angle required would have caused severe frontal damage. Photographs taken by **Fletcher** himself at the scene show no frontal damage to the car, contradicting that account.

53. On May 12, 2025, exactly one year after the wrongful repossession on Mother's Day 2024, **Truist** sent Petitioner an unsolicited email marketing communication offering vehicle financing, stating "*If it's time for a new car, we'll help you drive away happy*" and "*Love the car you're in now? Let's talk about refinancing to a better payment.*" **Truist** continued sending similar solicitations thereafter. At the time **Truist** sent these communications, Truist had already repossessed and sold Petitioner's car, issued a Notice of Sale, and formally denied all of Petitioner's claims by letter dated April 4, 2025. **Truist** therefore knew with certainty that

Petitioner had no vehicle to refinance and had been without transportation for one year as a direct result of **Truist's** own conduct.

54. **Truist** maintained and used Petitioner's personal information and contact data after the repossession for commercial marketing purposes without Petitioner's consent.

55. As a direct and proximate result of the wrongful repossession, Petitioner suffered loss of income, destruction of his business, loss of transportation, and financial hardship.

**F. The Wrongful Title Transfer by FDHSMV**

56. Following the repossession, **FDHSMV** transferred the certificate of title from Petitioner's name into **Truist's** name without obtaining a proper affidavit of repossession, a court order, or ensuring that Truist had proper standing since a lien with the **FDHSMV** itself, does not transfer ownership. **FDHSMV** was on notice of Petitioner's revocation of the Power of Attorney, as Petitioner delivered a copy of the revocation to **FDHSMV** directly, yet **FDHSMV** nonetheless completed the title transfer.

57. Petitioner reported the unlawful title transfer to **FDHSMV** and to local law enforcement; both declined to take action. Petitioner timely submitted a tort claim to the State of Florida and more than 180 days have elapsed without resolution.

**G. The Commercially Unreasonable Sale and Unlawful Deficiency Claim**

58. Following the repossession, **Truist** sent Petitioner a Notice of Intent to Sell Property at Private Sale dated May 22, 2024. The notice reflected a total balance of $29,439.47 including $27,874.62 in unpaid principal, $584.85 in interest, and $980.00 in repossession expenses.

59. In December 2025, **Truist** sold the 2019 Infiniti Q50 at auction for approximately $9,250.00. **Truist** thereafter sent Petitioner a letter asserting that Petitioner owed a deficiency balance of approximately $21,426.84.

60. **Truist** took no commercially reasonable steps to obtain market value for the collateral.

61. **Truist** failed to state a consistent balance across its communications regarding the alleged obligation. The May 22, 2024 rejection letter stated a balance of $29,832.84; a separate Notice of Intent to Sell dated the same day stated $29,439.47; the April 4, 2025 denial letter stated $30,332.84 was owed as of March 2024; and the January 16, 2026 deficiency notice stated a pre-sale balance of $28,459.47, to which **Truist** added $1,824.00 in repossession fees and $393.37 in NSF, collection, and attorney fees, despite no litigation having been initiated at that time.

**<u>H. Credit Reporting Violations</u>**

62. Beginning in January 2022, **Truist** began furnishing negative information to **Equifax**, **Experian**, and **TransUnion**, reporting the account as delinquent for approximately twenty-six months prior to its removal in March 2024. This

reporting began well before the May 2024 repossession, before **Truist** had ever validated the underlying obligation despite Petitioner's written demands, and upon information and belief after **Truist** had already securitized and transferred the beneficial interest in the note to a third party.

63. Beginning in January 2023, Petitioner engaged a third-party credit dispute company to formally dispute the derogatory tradelines with all three consumer reporting agencies. Despite receiving these disputes, **Truist** continued to verify the information as accurate, and each CRA continued to report it without further investigation.

64. In March 2024, following Petitioner's filing of a fraud report, the derogatory tradeline was removed from Petitioner's credit reports.

65. **Truist** made unauthorized inquiries into Petitioner's consumer credit reports, including an inquiry appearing on Petitioner's **Equifax** report dated January 9, 2024, and an inquiry appearing on Petitioner's **Equifax** report attributed to **Branch Banking and Trust Company** dated April 4, 2023. Neither of these inquiries were authorized by Petitioner.

66. A derogatory fictitious account was reported under the name **BB&T**, despite the Petitioner never having any account, contract, or business relationship with **BB&T**. **BB&T** merged with **SunTrust Bank** in December 2019 to form **Truist Financial Corporation**.

1. The inaccurate **Truist** tradeline reported by **Equifax**, **Experian**, and **TransUnion** arises from the same transaction and the same disputed obligation that forms the basis of all other claims in this action. Petitioner discovered that the CRA the lender sent their inquiry request to is irrelevant because the Petitioner's private data is being shared between all three CRAs simultaneously.

67. As a direct result of **Truist's** inaccurate furnishings and each CRA's failure to conduct a reasonable investigation, Petitioner suffered damage to his credit profile, denial of credit opportunities, increased borrowing costs, and emotional distress during the period of inaccurate reporting.

## VI. LEGAL CLAIMS

### COUNT I — WRONGFUL REPOSSESSION AND BREACH OF PEACE (Against Truist, BWA, Xtreme Towing, and Fletcher) - (Fla. Stat. §§ 679.609, 679.625; Florida Common Law)

68. Petitioner re-alleges paragraphs 38 through 55 as if fully set forth herein.

69. **Truist** directed and authorized the repossession through **BWA** as its skip-trace agent, and **Xtreme Towing** and **Fletcher** executed it. The duty to conduct a repossession lawfully is non-delegable, and a principal that authorizes a repossession is liable for the unlawful acts of its agents in carrying it out. Godwin v. Stanley, 331 S.W.2d 341, 342 (Tex. Civ. App. 1959).

70. **Fletcher** remained on Petitioner's private property for approximately one hour after being told to leave and not return, then returned on Mother's Day 2024 to take the car while publicly defaming Petitioner.

71. Once Petitioner instructed **Fletcher** to leave the property and not return, any subsequent entry and taking constituted a breach of the peace as a matter of law regardless of the validity of the underlying security interest. Florida Statute § 679.609 authorizes self-help repossession only if the secured party proceeds without breach of the peace. A debtor's objection to repossession, however slight, revokes any implied consent to enter the debtor's property, and entry after consent is revoked constitutes a breach of the peace as a matter of law. Seibel v. Society Lease, Inc., 969 F. Supp. 713, 718 (M.D. Fla. 1997); In re 53 Foot Trawler Pegasus, 2008 WL 4938345, at *4 (M.D. Fla. 2008).

72. The Retail Installment Sales Contract, received from the **Dealership,** governing this transaction explicitly addresses self-help repossession in its arbitration provision, stating: "*Neither you nor we waive the right to arbitrate by using self-help remedies, such as repossession.*"

73. **BWA** and **Xtreme Towing** are independently liable under 15 U.S.C. § 1692f(6), which prohibits taking nonjudicial action to effect dispossession where there is no present right to possession through an enforceable security interest. 15 U.S.C. §§ 1692a(6); Jordan v. Kent Recovery Services, Inc., 731 F. Supp. 652, 657 (D. Del. 1990). As alleged above, **Truist's** security interest never validly attached, so **BWA** and **Xtreme Towing** had no present right to possession when they took the car. A security interest creates only a lien and does not convey ownership of the collateral. In re Pubs, Inc. of Champaign, 618 F.2d 432 (7th Cir. 1980); U.S. v.

Whiting Pools, Inc., 462 U.S. 198, 210-11 (1983); Matter of Continental Airlines, Inc., 932 F.2d 282 (3d Cir. 1991).

74. Besides the lien never attaching properly, **Truist** didn't have the right to take the car under any circumstances. Under First National Bank v. La Joie, 537 P.2d 1207 (Okla. 1975), and 17 Am. Jur. 2d § 344, the financing of an automobile by a bank acting only as assignee of the automobile sales contract constitutes an illegal taking of security in addition to the purchased automobile. Truist's status as assignee therefore independently precluded it from holding a valid security interest in the car.

75. Because the car constitutes consumer goods under Florida Statute § 679.1021(1)(x), and **Truist** cannot establish that the disposition was commercially reasonable, Florida Statute § 679.626(3) limits any deficiency **Truist** may claim to the amount by which the secured obligation exceeds the greater of the actual sale proceeds or the proceeds that would have been realized in a compliant sale. Separately, under Florida Statute § 679.625(3)(b), Petitioner is entitled to recover, in any event, an amount not less than the credit service charge plus ten percent of the principal amount of the obligation, which here totals $12,534.36, as a statutory recovery owed to Petitioner for **Truist's** noncompliance.

76. WHEREFORE, Petitioner seeks actual damages, the statutory penalty under § 679.625, a declaration that the deficiency claim is limited under § 679.626(3), statutory damages under 15 U.S.C. § 1692k against **Truist**, **BWA**, **Xtreme**

**Towing**, and **Fletcher**, value of the car at the time of repossession, and all other relief this Court deems just and proper.

**COUNT II — VIOLATIONS OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT (Against Truist, BWA, Xtreme Towing, and Fletcher) - (Fla. Stat. § 559.55 et seq.)**

77. Petitioner re-alleges paragraphs 35 through 36, 42 through 55, and 62 through 68 as if fully set forth herein.

78. **Truist** violated Florida Statute § 559.715 by failing to provide Petitioner written notice of the assignment of his debt at least 30 days before attempting to collect.

79. **Truist, BWA, Xtreme Towing,** and **Fletcher** violated Florida Statute § 559.72 as follows:

   a. **Truist** violated § 559.72(9) by using the void Power of Attorney to assert a legal right to repossess the car that it knew did not exist, and by claiming and pursuing a deficiency it knew or should have known was not legitimately due including pursuing a deficiency limited under § 679.626(3), pursuing collection on a security interest that never attached, failing to credit insurance proceeds, and including unauthorized attorney fees in the January 16, 2026 deficiency notice before any legal proceedings had been initiated.

   b. **Truist** violated § 559.72(5) by disclosing false credit information to **Equifax**, **Experian**, and **TransUnion**, including unvalidated delinquency reporting and

the phantom **BB&T** tradeline described above, with knowledge or reason to know the information was false.

c. **Fletcher**, **Xtreme Towing**, and **BWA** violated § 559.72(5) by disclosing false information affecting Petitioner's reputation to neighbors, the FDACS, the county, and the Sheriff's Office, as described above, with no legitimate collection purpose.

d. **Truist** violated § 559.72(6) by continuing to report the debt to all three consumer reporting agencies after Petitioner formally disputed it beginning in January 2023, without disclosing the dispute as required.

e. **Truist**, **BWA**, **Xtreme Towing**, and **Fletcher** violated § 559.72(7) by engaging in the harassing conduct described above during the repossession, including the initial trespass, unauthorized photographing, the return to Petitioner's property on Mother's Day 2024, and the demand that Petitioner surrender his car key and pay fees to retrieve his personal property.

f. **Truist** violated § 559.72(7) by sending the May 12, 2025 marketing email described above, conduct that could reasonably be expected to harass Petitioner given **Truist's** knowledge that it had already repossessed and sold his car and denied his claims.

80. As a direct result of these violations, Petitioner suffered damage to his credit profile, emotional distress, loss of use of his car, and financial harm. Each violation is independently actionable, and the FCCPA is a strict liability statute

under which **Truist, BWA, Xtreme Towing,** and **Fletcher**'s good faith is not a defense.

81. WHEREFORE, Petitioner seeks actual damages, statutory damages of $1,000.00 per violation pursuant to Fla. Stat. § 559.77, declaratory and injunctive relief enjoining further collection activity on the alleged deficiency, attorneys' fees and costs, and all other relief this Court deems just.

**COUNT III — FLORIDA CIVIL THEFT (Against Truist, BWA, Xtreme Towing, and Fletcher) - (Fla. Stat. §§ 772.11, 812.014)**

82. Petitioner re-alleges paragraphs 31 through 37 and 43 through 55 as if fully set forth herein.

83. **Truist**, **BWA**, **Xtreme Towing**, and **Fletcher** knowingly obtained and used Petitioner's car through the void Power of Attorney with felonious intent to deprive Petitioner of it, in violation of Florida Statute § 812.014.

84. Petitioner has served or will serve the statutory written demand for return of the property and compensation pursuant to Florida Statute § 772.11.

85. WHEREFORE, Petitioner seeks treble damages, attorneys' fees, costs, and all other relief this Court deems just and proper.

**COUNT IV — CONVERSION (Against Truist, BWA, Xtreme Towing, and Fletcher) - (Florida Common Law)**

86. Petitioner re-alleges paragraphs 31 through 37 and 43 through 55 as if fully set forth herein.

87. Conversion is the exercise of wrongful dominion and control over the property of another to the detriment of the actual owner, and may be demonstrated by a plaintiff's demand and a defendant's refusal to return the property. Mayo v. Allen, 973 So. 2d 1257, 1259 (Fla. 1st DCA 2008). This Count alleges two separate categories of conversion.

88. As to the car: Petitioner was its lawful owner at the time of the repossession. The Power of Attorney relied upon by **Truist**, **BWA**, **Xtreme Towing**, and **Fletcher** to authorize the repossession was void ab initio, and **Truist's** security interest never validly attached, as alleged above. **Truist**, **BWA**, **Xtreme Towing**, and **Fletcher** therefore had no lawful authority to take the car, and their taking, retention, and sale of it constitutes conversion. See First Nat. Bank v La Joie (Okla) 537 P2d 1207, 86 ALR3d 309. - UCCC § 3.301(1), 17 Am Jur 2d § 344 Pg. 259. The measure of damages is the car's fair market value at the time of taking, which considerably exceeds the $9,250.00 **Truist** obtained at auction.

89. As to the negotiable instruments: In 2024, Petitioner tendered to **Truist** an endorsed customer copy of the Retail Installment Contract and endorsed coupon instruments. **Truist** rejected these instruments by letter dated May 22, 2024, but retained them without crediting Petitioner's account, without returning them, and without providing the accounting Petitioner demanded under UCC § 9-210 or F.S. § 679.210. Under UCC § 3-420 or F.S. § 673.4201, retaining an

instrument after formal rejection without returning it or providing credit constitutes conversion.

90. **Truist**, **BWA**, **Xtreme Towing**, and Fletcher who participated in, directed, or facilitated the conversion of the car are jointly and severally liable for that conversion.

91. **Truist** alone is liable for the conversion of the negotiable instruments.

92. WHEREFORE, Petitioner seeks compensatory damages equal to the fair market value of the converted car, the value of the converted negotiable instruments, punitive damages, costs, and all other relief this Court deems just.

## COUNT V — FRAUD IN THE INDUCEMENT AND EQUITABLE RESCISSION (Against the Dealership and Truist) - (Florida Common Law; Equity)

93. Petitioner re-alleges paragraphs 23 through 42 as if fully set forth herein.

94. **Truist's** role was solely that of an assignee and servicer, yet **Truist** acted throughout as if it were the original contracting party, the holder in due course, and the entity with full enforcement and repossession rights. As an assignee, **Truist** took the contract subject to all defenses Petitioner could assert against the **Dealership** under Florida Statute § 516.31(2).

95. The Retail Installment Sales Contract contains the FTC Holder Notice required under 16 C.F.R. § 433.2, making any holder of the contract subject to all claims and defenses which the debtor could assert against the seller. By the terms of §

433.2, it applies only to a "purchase money loan", "financed sale", or "consumer credit contract" as defined in 16 C.F.R. § 433.1(d), (e), & (i). Section 433.1(d) defines a purchase money loan as a cash advance received by the consumer in return for a finance charge. Petitioner never received any cash advance, check, wire transfer, or other direct tender of funds from the **Dealership** or **Truist**. The inclusion of this notice on a contract representing a transaction type that did not factually occur as defined, constitutes a further misrepresentation to Petitioner regarding the nature of the transaction and further asserts the misrepresentation, warranty, and unconscionability claims alleged herein

96. The **Dealership** made the following material misrepresentations and omissions to induce Petitioner into executing the Retail Installment Contract:

a. Representing that the total cost of the car was $34,988.00 while the contract reflected a Total Sales Price of $49,972.44;

b. Adding a charge of $2,980.00 for warranty coverage to the financed amount for coverage already included in the car's CPO designation;

c. Charging sales tax in excess of the applicable rate. Charged sales tax based on the car being a commercial vehicle instead of it being a private car not subject to the same tax;

d. Failing to disclose that the promissory note would be used to immediately pay off the **Dealership's** floor plan financing allowing them to receive full value from the Petitioner's consideration;

e. Failing to disclose that the note would be assigned to **Truist** and securitized changing the beneficial owner;

f. Failing to disclose the placement of lender-protective insurance products on the car and note;

g. Presenting the contract via electronic iPad under time pressure without adequate opportunity to review, and falsely representing that Petitioner would receive a copy to review later;

h. Failing to disclose that Petitioner's credit application and personal financial data would be submitted to and monetized by the dealership and multiple competing lenders simultaneously including **Truist**;

i. Requiring Petitioner to execute a contractual affirmation that he had reviewed the contract in its entirety, when he had not been given a meaningful opportunity to do so;

j. Failing to disclose known material defects in the car, specifically the prior modifications and turbocharger damage.

k. Structuring the transaction so that Petitioner gave an unconditional promissory note and security interest, while the **Dealership** gave only conditional possession of the car subject to a retained security interest immediately assigned to a third party.

97. Petitioner discovered these misrepresentations and omissions in 2024, which is the date from which the discovery rule tolls any applicable limitations period. The **Dealership** had a duty to disclose these material facts, and its silence constitutes

fraud. United States v. Tweel, 550 F.2d 297, 299 (5th Cir. 1977). It is not necessary for rescission that the party making the misrepresentation knew it was false; recovery is allowed even for innocent misrepresentation because it would be unjust to allow one who made false representations, even innocently, to retain the fruits of a bargain induced by such representations. Whipp v. Iverson, 43 Wis. 2d 166, 171, 168 N.W.2d 201 (1969).

98. As a result of this fraud in the inducement, the Retail Installment Contract is voidable and Petitioner is entitled to equitable rescission restoring both parties to their pre-contract positions.

99. WHEREFORE, Petitioner seeks equitable rescission, restitution of all sums paid, release of the alleged obligation, clear title to the car or its equivalent value, and all other equitable relief this Court deems just.

**COUNT VI — UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST**

**(Against the Dealership and Truist) - (Florida Common Law; Equity)**

100. Petitioner re-alleges paragraphs 23 through 42, 47 through 55, and 58 through 61 as if fully set forth herein.

101. The **Dealership** received and retained the benefit of Petitioner's promissory note, used to pay off its own floor plan financing, and the commercial value of Petitioner's credit application and personal data, transmitted to multiple lenders without Petitioner's knowledge or consent.

102. **Truist** received and retained gain-on-sale proceeds from the securitization of Petitioner's note, ongoing servicing fees, insurance proceeds, and the auction proceeds from the sale of Petitioner's car. Under First National Bank v. La Joie, 537 P.2d 1207 (Okla. 1975), and 17 Am. Jur. 2d § 344, the financing of an automobile by a bank acting only as assignee of the automobile sales contract constitutes an illegal taking of security in addition to the purchased automobile. Truist's status as assignee therefore independently precluded it from holding a valid security interest in the car.

103. The **Dealership** and **Truist's** retention of these benefits, obtained through fraud, concealment, and the unauthorized conversion of Petitioner's property, is inequitable and unjust. **Truist** gave nothing of value directly to Petitioner, yet acquired the right to enforce Petitioner's unconditional obligations and to profit from Petitioner's note through securitization.

104. **Truist** further received insurance proceeds constituting collateral under the security interest, including any proceeds of the lender-protective and default insurance products described above, and retained those proceeds without crediting them against Petitioner's outstanding balance, unjustly enriching itself in that amount. A party that profits from another's obligation without giving that party direct consideration holds those profits subject to a constructive trust in equity. Restatement (Third) of Restitution and Unjust Enrichment § 55.

105. Petitioner demands a full equitable accounting of all profits, securitization proceeds, servicing fees, insurance proceeds, and any other financial benefits derived from Petitioner's transaction, together with disgorgement of all ill-gotten gains.

106. WHEREFORE, Petitioner seeks imposition of a constructive trust, disgorgement, equitable accounting, restitution, and all other equitable relief this Court deems just.

**COUNT VII — BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (Against Truist) - (Florida Common Law)**

107. Petitioner re-alleges paragraphs 31 through 42, 47 through 55, and 58 through 61 as if fully set forth herein.

108. The implied covenant of good faith and fair dealing inheres in every Florida contract and requires that neither party act to destroy the other's right to receive the fruits of the contract. County of Brevard v. Miorelli Engineering, Inc., 703 So. 2d 1049, 1050-51 (Fla. 1997). Petitioner reasonably expected that the party collecting payments would have authority to release the lien, that insurance proceeds would reduce any balance before a deficiency was pursued, and that the debt would be validated upon demand. **Truist's** conduct destroyed each expectation.

109. **Truist** breached this covenant by securitizing the note while collecting as if it remained the true holder; refusing to validate the debt or provide an accounting

under UCC § 9-210; directing a repossession on a disputed obligation; conducting a commercially unreasonable sale; pursuing a deficiency limited under Florida Statute § 679.626(3); and retaining insurance proceeds without crediting them.

110. As alleged above, **Truist's** security interest never validly attached and it gave no value or consideration to Petitioner. **Truist** therefore held no genuine interest in the obligation, and its acquisition and securitization of the note exceeded its lawful authority.

111. WHEREFORE, Petitioner seeks compensatory damages for breach of the implied covenant, disgorgement of all profits obtained through **Truist's** conduct, a full equitable accounting of all payments and benefits received from Petitioner's instrument, and all other relief this Court deems just.

**COUNT VIII — FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Against Truist, the Dealership, and Fletcher) - (Fla. Stat. §§ 501.201–501.213)**

112. Petitioner re-alleges paragraphs 23 through 37, 47 through 55, and 58 through 61 as if fully set forth herein.

113. **Truist,** the **Dealership,** and **Fletcher** engaged in unfair, deceptive, and unconscionable trade practices in violation of Fla. Stat. § 501.204, including but not limited to:

a. The **Dealership** adding a charge of $2,980.00 for warranty coverage that was not included in the advertised price and was duplicative of coverage already provided by the car's CPO certification;

b. **Truist** concealing that the entity collecting payments might not be the true holder of the note with authority to release the lien upon payoff;

c. **Truist** collecting insurance proceeds covering its losses upon Petitioner's default while simultaneously pursuing Petitioner for the full deficiency balance, constituting double recovery;

d. The **Dealership** using economic duress at the point of sale to induce execution of the contract;

e. The **Dealership** selling insurance products through unlicensed employees;

f. **Truist** pursuing a deficiency claim after a commercially unreasonable sale and after collecting insurance proceeds;

g. **Fletcher** making false statements about Petitioner to regulatory agencies and law enforcement to discredit his legitimate complaints;

h. The **Dealership** submitting Petitioner's credit application and personal financial data to multiple lenders simultaneously without disclosure, for a profit;

i. **Truist** sending Petitioner the unsolicited marketing email described above, exploiting the financial vulnerability caused by its own prior conduct to market predatory financial products to Petitioner.

114. WHEREFORE, Petitioner seeks actual damages, declaratory and injunctive relief, civil penalties of $10,000 per violation pursuant to Fla. Stat. § 501.2075, attorneys' fees and costs pursuant to Fla. Stat. § 501.2105, and all other relief this Court deems just.

**COUNT IX — DEFAMATION AND INVASION OF PRIVACY (Against Fletcher, Xtreme Towing, BWA, and Truist) - (Florida Common Law; Defamation Per Se; Fla. Stat. § 836.01 et seq.; Fla. Stat. § 540.08)**

115. Petitioner re-alleges paragraphs 47 through 55 and 62 through 68 as if fully set forth herein.

116. Fletcher, **Xtreme Towing**, and **BWA** published false statements of fact about Petitioner, including characterizing him as a "Sovereign Citizen" to neighbors, the FDACS, the county, and the Sheriff's Office, and **Fletcher's** fabricated account of the first repossession attempt. These statements were false, made with actual malice or reckless disregard for their truth, published to third parties without privilege, and caused harm to Petitioner's reputation and emotional distress. A statement is defamatory if it tends to prejudice the plaintiff in the eyes of a substantial and respectable minority of the community. Jews for Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1115 (Fla. 2008)

117. **Fletcher** separately entered Petitioner's private property without consent and photographed Petitioner and members of his family without their knowledge or consent, for the purpose of documenting a commercial debt collection activity.

Florida recognizes a common law right of privacy, the unwarranted invasion of which is actionable. Cason v. Baskin, 155 Fla. 198, 20 So. 2d 243 (1944). This conduct, together with **Fletcher's** use of Petitioner's likeness in connection with a commercial debt collection activity, also violates Florida Statute § 540.08, which prohibits the use of a person's name or likeness for commercial purposes without express written consent.

118. To the extent 15 U.S.C. § 1681h(e) preserves state common law defamation claims arising from the furnishing of false credit information where the furnisher acted with malice or willful intent, **Truist's** credit reporting conduct independently constitutes defamation. **Truist** reported derogatory information on an obligation it repeatedly refused to validate; caused the reporting of a phantom **BB&T** tradeline for an account that never existed; removed the tradeline only after Petitioner's fraud report rather than after any reinvestigation; and made two unauthorized inquiries during the same period it was disputing Petitioner's regulatory complaints. Each instance constitutes a publication to a third party of a false statement concerning Petitioner. Petitioner pleads this theory in the alternative and in addition to the FCRA claims set forth above.

119. WHEREFORE, Petitioner seeks compensatory and punitive damages against Fletcher, Xtreme Towing, and BWA for defamation and invasion of privacy; compensatory and punitive damages against Truist for defamation arising from

false credit reporting; injunctive relief prohibiting further false statements; and all other relief this Court deems just.

**COUNT X — REPLEVIN / CLAIM-AND-DELIVERY (Against Truist, BWA, Xtreme Towing, and Fletcher) - (Fla. Stat. § 78.01 et seq.; § 78.068 (prejudgment replevin); § 78.19 (monetary equivalent); Fla. Stat. § 679.609)**

120. Petitioner re-alleges paragraphs 43 through 55 and 58 through 61 as if fully set forth herein.

121. At the time of the wrongful repossession, Petitioner was the lawful owner and was entitled to immediate possession of the 2019 Infiniti Q50, VIN JN1FV7AP2KM760395. Respondents **Truist**, **BWA**, **Xtreme Towing**, and **Fletcher** wrongfully took and detained Petitioner's car without lawful authority, in that: (a) the Power of Attorney relied upon was void ab initio for failure to comply with Florida Statute § 319.225(6); (b) Petitioner had revoked all security interests and powers of attorney granted to **Truist** and the **Dealership** prior to the taking; and (c) the repossession was conducted in breach of the peace in violation of Florida Statute § 679.609(2), rendering the taking unlawful as a matter of law; (d) Under First National Bank v. La Joie, 537 P.2d 1207 (Okla. 1975), and 17 Am. Jur. 2d § 344, the financing of an automobile by a bank acting only as assignee of the automobile sales contract constitutes an illegal taking of security in addition to the purchased automobile.

122. **Xtreme Towing** and **Fletcher** further wrongfully detained Petitioner's personal property located within the car at the time of taking, and coerced Petitioner to pay fees and surrender the car key as conditions of retrieving those personal items, constituting additional unlawful detention of Petitioner's property.

123. The car has since been sold at private auction for approximately $9,250.00. As **Truist, BWA, Xtreme Towing,** and **Fletcher** have rendered return of the specific car impossible through their own wrongful act, Petitioner is entitled to the fair market value of the car at the time of the wrongful taking as the equivalent monetary remedy to replevin, together with the value of any personal property detained and not returned, and all costs and damages flowing from the unlawful detention.

124. WHEREFORE, Petitioner seeks judgment in the amount of the fair market value of the converted car at the time of taking, the value of all detained personal property, damages for the period of unlawful detention, costs, and all other relief this Court deems just and proper.

**COUNT XI — WRONGFUL TITLE TRANSFER AND DEPRIVATION OF RIGHTS (Against FDHSMV) - (Fla. Stat. §§ 319.22, 319.28; 42 U.S.C. § 1983; Fla. Stat. § 768.28)**

125. Petitioner re-alleges paragraphs 43 through 46 and 56 through 57 as if fully set forth herein.

126. The **FDHSMV** must follow Florida Statute § 319.22 which establishes that a certificate of title is prima facie evidence of ownership, and a lienholder is not the owner; a security interest creates only a lien and does not transfer ownership of the collateral. In re Pubs, Inc. of Champaign, 618 F.2d 432 (7th Cir. 1980); U.S. v. Whiting Pools, Inc., 462 U.S. 198 (1983); Matter of Continental Airlines, 932 F.2d 282 (3d Cir. 1991). Florida Statute § 319.28 requires strict compliance with prescribed procedures, including a properly executed affidavit, before title may be transferred upon repossession.

127. Upon information and belief, neither the **Dealership** nor **Truist** ever filed a UCC financing statement; Petitioner's own filing is the only one of record. A party seeking to enforce a note must establish a complete and authenticated chain of endorsements. BAC Funding Consortium Inc. ISAOA/ATIMA v. Jean-Jacques, 28 So. 3d 936, 939 (Fla. 2d DCA 2010). Absent production of the original note with a verified chain of title, **Truist's** claimed right of enforcement is unproven.

128. **FDHSMV** transferred title to Petitioner's car from Petitioner's name to the lienholder's name without a court order, without a proper affidavit of repossession, without validation of lien, proof of standing, and in reliance on a void and fraudulent Power of Attorney. This transfer was unlawful and void.

129. **FDHSMV** was aware of the revocation of the Power of Attorney as they also received a revocation of POA from the Petitioner removing any fraudulent authority.

130. **FDHSMV**'s actions, taken under color of state law, deprived Petitioner of his property interest without due process of law in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

131. Petitioner filed a timely tort claim against the **FDHSMV** under Florida Statute § 768.28. More than 180 days have elapsed without resolution, ripening this claim for judicial action.

132. WHEREFORE, Petitioner seeks compensatory damages against **FDHSMV** under Florida Statute § 768.28, declaratory and injunctive relief under 42 U.S.C. § 1983, and all other relief this Court deems just.

## COUNT XII — VIOLATIONS OF THE FAIR CREDIT REPORTING ACT

**(Against Truist, Equifax, Experian, and TransUnion) - (15 U.S.C. § 1681 et seq.)**

133. Petitioner re-alleges paragraphs 42 and 62 through 68 as if fully set forth herein.

134. **Truist** as Furnisher — Inaccurate Reporting. **Truist** is a furnisher of credit information subject to 15 U.S.C. § 1681s-2. Beginning in or around January 2022, **Truist** began furnishing negative information to **Equifax**, **Experian**, and **TransUnion**, reporting Petitioner's account as delinquent for approximately twenty-six months. This reporting was inaccurate because **Truist** never validated the underlying obligation despite timely written demands, had upon information and belief already securitized and transferred the beneficial interest in the note before the reporting began, and because **Truist's** purported security interest never validly attached under Florida Statute § 679.2031(1).

135. **Truist** as Furnisher — Failure to Investigate After Dispute. Beginning in or around January 2023, Petitioner engaged a third-party credit dispute company to formally dispute the derogatory tradelines with all three consumer reporting agencies. Each dispute constituted notice of a consumer dispute under 15 U.S.C. § 1681s-2(b), triggering **Truist's** obligation to conduct a reasonable investigation. **Truist** failed to investigate and continued to verify the information as accurate. The tradeline was removed in March 2024 only after Petitioner filed a fraud report, not after any **Truist** investigation, demonstrating that its prior verifications had no factual basis.

136. **Truist** — Phantom **BB&T** Tradeline on **Equifax**. A derogatory tradeline was reported on Petitioner's **Equifax** report under the name BB&T, despite Petitioner never having had any account or relationship with BB&T. BB&T merged with SunTrust Bank in December 2019 to form **Truist** Financial Corporation; Petitioner only ever did business with SunTrust, later **Truist**. This constitutes the furnishing of false information regarding an account that does not exist, in violation of 15 U.S.C. § 1681s-2(a)(1)(A), and artificially multiplied the derogatory impact on Petitioner's credit profile.

137. **Truist** — Unauthorized Inquiries. **Truist** made unauthorized inquiries into Petitioner's credit reports without a permissible purpose, including one dated January 9, 2024 and one dated April 4, 2023 attributed to **Branch Banking and Trust Company**, sharing the same address as Truist Financial Corporation.

Neither inquiry was authorized by Petitioner. 15 U.S.C. § 1681b. Petitioner expressly reserves the right to identify additional unauthorized inquiries upon completion of discovery.

138. **Equifax** — Failure to Conduct Reasonable Reinvestigation. **Equifax** received Petitioner's disputes beginning in January 2023, failed to conduct a reasonable reinvestigation as required by 15 U.S.C. § 1681i, continued to report the inaccurate information in violation of § 1681e(b), and failed to identify or correct the phantom **BB&T** tradeline or remove the two unauthorized hard inquiries.

139. **Experian** — Failure to Conduct Reasonable Reinvestigation. **Experian** received Petitioner's disputes beginning in January 2023, failed to conduct a reasonable reinvestigation as required by 15 U.S.C. § 1681i, and continued to report the inaccurate **Truist** tradeline in violation of § 1681e(b).

140. **TransUnion** — Failure to Conduct Reasonable Reinvestigation. **TransUnion** received Petitioner's disputes beginning in January 2023, failed to conduct a reasonable reinvestigation as required by 15 U.S.C. § 1681i, and continued to report the inaccurate **Truist** tradeline in violation of § 1681e(b).

141. Willfulness and Damages. Willfulness under the FCRA includes reckless disregard of statutory obligations, not only knowing violations. Safeco Insurance Co. of America v. Burr, 551 U.S. 47, 57 (2007). **Truist's** willfulness is shown by reporting an unvalidated obligation, verifying disputed information without

investigation, furnishing a fictitious tradeline, making unauthorized inquiries, and removing the tradeline only after a fraud report. **Truist's** willfulness is further supported by the fact that **Truist's** predecessor **SunTrust Mortgage, Inc**. entered into a $968 million enforcement resolution with federal and state authorities in 2014 for systemic consumer servicing misconduct, demonstrating institutional awareness that its consumer servicing practices were subject to regulatory scrutiny and legal obligation.

142. Each CRA's willfulness is shown by reporting disputed information without investigation and failing to identify the facially obvious phantom tradeline. Petitioner suffered actual damages during the twenty-six-month reporting period, including credit damage, denial of credit, increased borrowing costs, and emotional distress, compensable under § 1681o independent of statutory damages under § 1681n.

143. WHEREFORE, Petitioner seeks actual damages for each month of inaccurate reporting and each unauthorized inquiry; statutory damages of $100.00 to $1,000.00 per violation under 15 U.S.C. § 1681n against **Truist**, **Equifax**, **Experian**, and **TransUnion**; punitive damages; injunctive relief requiring permanent deletion of all inaccurate tradelines and unauthorized inquiries; attorneys' fees and costs under 15 U.S.C. §§ 1681n and 1681o; and all other relief this Court deems just and proper.

**COUNT XIII — VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT (Against Truist, BWA, Fletcher and Xtreme Towing) - (15 U.S.C. § 1692 et seq.)**

144. Petitioner re-alleges paragraphs 35, 42 through 55, and 62 through 68 as if fully set forth herein.

145. To the extent **Truist** is a creditor, the FCCPA applies regardless of creditor status. Davidson v. Capital One Bank (USA), N.A., 797 F.3d 1309 (11th Cir. 2015).

146. **BWA** and **Xtreme Towing** are debt collectors under 15 U.S.C. § 1692a(6) as entities enforcing security interests of others. Jordan v. Kent Recovery Services, Inc., 731 F. Supp. 652 (D. Del. 1990). Having prevailed on the position that it was not a party to the arbitration agreement, **Truist** is judicially estopped from invoking that clause as a defense here. New Hampshire v. Maine, 532 U.S. 742 (2001).

147. Federal Rule of Civil Procedure 17(a)(1) requires that an action be prosecuted in the name of the real party in interest. To the extent **Truist** securitized and transferred beneficial ownership of the note, it is not the real party in interest with standing to enforce the obligation, direct repossession, or pursue a deficiency.

148. **Truist, BWA,** and **Xtreme Towing** violated the FDCPA as follows:

a. **Truist** pursued collection of a debt that was disputed and never validated, and continued collection activity after receiving Petitioner's written validation demand without providing verification, in violation of the mandatory cessation

requirement of 15 U.S.C. § 1692g(b), including directing the repossession, pursuing the deficiency claim of approximately $21,426.84, and furnishing derogatory credit information. **Truist's** right to take the car was independently precluded by its status as assignee only. Under First National Bank v. La Joie, 537 P.2d 1207 (Okla. 1975), and 17 Am. Jur. 2d § 344, a bank acting solely as assignee of an automobile sales contract acts illegally in taking security in addition to the purchased automobile.

b. **Truist** made false and misleading representations regarding the amount owed and its status as lawful holder of the note, in violation of 15 U.S.C. § 1692e(2) and § 1692e(10);

c. **Truist** used unfair and unconscionable means to collect the debt, including directing the physical taking of the car using a void Power of Attorney, in violation of 15 U.S.C. § 1692f;

d. **Fletcher** communicated with third parties regarding Petitioner's alleged debt status during the repossession, in violation of 15 U.S.C. § 1692c(b);

e. **Truist** pursued a deficiency claim on a debt dischargeable under the commercially unreasonable sale, in violation of 15 U.S.C. § 1692e and § 1692f;

f. **Truist** engaged in conduct whose natural consequence was to harass Petitioner, in violation of 15 U.S.C. § 1692d, by sending the May 12, 2025 marketing email described above exactly one year after the repossession,

knowing it had already repossessed and sold Petitioner's car and denied his claims.

149. **BWA** and **Xtreme Towing** took nonjudicial action to effect dispossession of Petitioner's car when there was no present right to possession through an enforceable security interest, in violation of 15 U.S.C. § 1692f(6).

150. WHEREFORE, Petitioner seeks actual damages, statutory damages of $1,000.00 per violation, declaratory and injunctive relief, attorneys' fees and costs pursuant to 15 U.S.C. § 1692k.

**COUNT XIV — VIOLATIONS OF THE TRUTH IN LENDING ACT (Against the Dealership and Truist) - (15 U.S.C. § 1601 et seq.)**

151. Petitioner re-alleges paragraphs 23 through 30 as if fully set forth herein.

152. The Retail Installment Sales Contract is a consumer credit transaction subject to TILA, 15 U.S.C. § 1638, and Regulation Z, 12 C.F.R. Part 1026.

153. The **Dealership**, as originator, bore the primary TILA disclosure obligation. The **Dealership** violated 15 U.S.C. § 1605 by rolling a $2,980.00 warranty charge and $245.72 in excess sales tax into the Amount Financed when there shouldn't have been a sales tax at all for a private car, and failing to disclose required insurance premiums in the finance charge, overstating the disclosed finance charge and understating the APR. The contract required Petitioner to maintain physical damage insurance covering the lender's interest as a condition of the credit transaction; the disclosure of Petitioner's right to choose the insurer appeared on

page two among terms Petitioner had no meaningful opportunity to review, and does not satisfy the clear and conspicuous separate disclosure required by 12 C.F.R. § 1026.4(d)(2) to exempt this cost from the finance charge. **Truist**, as assignee, is liable for these violations to the extent apparent on the face of the disclosure statement. 15 U.S.C. § 1641(a).

154. Petitioner raises these TILA violations in recoupment as a defense to any deficiency claim, which permits assertion of time-barred statutory claims defensively when the creditor seeks to enforce the same transaction. Beach v. Ocwen Federal Bank, 523 U.S. 410 (1998).

155. WHEREFORE, Petitioner seeks recoupment of actual damages, statutory damages, and all other relief this Court deems just and proper pursuant to 15 U.S.C. § 1640.

**COUNT XV — RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (Against Truist, the Dealership, BWA, Xtreme Towing, and Fletcher) - (18 U.S.C. §§ 1961–1964)**

156. Petitioner re-alleges paragraphs 23 through 46 and 47 through 57 as if fully set forth herein.

157. **Truist**, the **Dealership**, **BWA**, **Xtreme Towing**, and Fletcher, together with their agents, formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), the purpose of which was to profit from the fraudulent origination, assignment, securitization, and enforcement of consumer auto loan contracts

while concealing material facts from borrowers, directing unlawful repossessions, and obstructing borrowers' attempts to dispute their obligations. Civil RICO liability does not require a prior criminal conviction; it requires only that the defendant caused harm through predicate acts constituting a pattern of racketeering activity. Durante Bros. & Sons, Inc. v. Flushing National Bank, 755 F.2d 239, 248 (2d Cir. 1985).

158. The enterprise engaged in a pattern of racketeering activity including:

a. Mail fraud under 18 U.S.C. § 1341, through the transmission of fraudulent loan documents, collection letters, and demands by United States mail;

b. Wire fraud under 18 U.S.C. § 1343, through electronic communications used to direct the repossession and collection scheme;

c. Transportation of a stolen car under 18 U.S.C. § 2312, as the car was taken without lawful authority and transported across county lines;

d. Financial institution fraud under 18 U.S.C. § 1344, through a scheme to obtain money and property by materially false representations in connection with a financial institution transaction.

159. The predicate acts, spanning from February 2020 through 2026, satisfy closed-ended continuity. H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 241-42 (1989). As to open-ended continuity, **Truist's** documented CFPB complaint history showing debt collection practices as the highest category of consumer grievances against it demonstrates that the conduct alleged herein is part of an ongoing institutional pattern rather than an isolated occurrence. The

enterprise further exploited **FDHSMV's** administrative processes by submitting repossession documentation through its agents BWA and Xtreme Towing that foreseeably resulted in FDHSMV retitling Petitioner's car into Truist's name without lawful authority, using the state's administrative machinery to convert the unlawful taking of Petitioner's car into an apparently legitimate title transfer.

160. As a direct and proximate result, Petitioner suffered injury to property including the loss of his car, loss of payments made, damage to his credit profile, and costs of responding to the enterprise's fraudulent scheme.

161. WHEREFORE, Petitioner seeks treble damages pursuant to 18 U.S.C. § 1964(c), injunctive relief, attorneys' fees and costs, and all other relief this Court deems just.

**COUNT XVI — INSURANCE LICENSING AND FRAUD (Against the Dealership and Truist) - (15 U.S.C. § 6701; Fla. Stat. § 626.112; 18 U.S.C. § 1033)**

162. Petitioner re-alleges paragraphs 23 through 30 as if fully set forth herein.

163. The **Dealership's** employees who sold the warranty and insurance products to Petitioner were not licensed insurance producers under Florida Statute § 626.112. The sale of insurance by unlicensed persons violates Florida law and constitutes an unfair trade practice and a basis for rescission of those charges.

164. The insurance and warranty products placed on this transaction by the **Dealership** include but are not limited to those listed on the Retail Installment Sales Contract, including lender-protective default insurance whose premiums were rolled into

the amount financed and paid by Petitioner over the loan term. The specific identity, terms, and premium amounts of these products are within the exclusive knowledge of **Truist** and the **Dealership** and will be established through discovery. **Truist's** collection on default insurance following Petitioner's default, while simultaneously pursuing Petitioner for the full deficiency, constitutes double recovery and fraud in connection with an insurance transaction under 18 U.S.C. § 1033.

165. WHEREFORE, Petitioner seeks disgorgement of all insurance premiums collected, restitution, civil penalties, referral to the Florida Department of Financial Services for enforcement, and all other relief this Court deems just.

**COUNT XVII — UNCONSCIONABILITY (Against the Dealership and Truist) - (Florida Common Law and UCC)**

166. Petitioner re-alleges paragraphs 23 through 30 as if fully set forth herein.

167. The Retail Installment Contract is both procedurally and substantively unconscionable. Procedurally, the **Dealership** presented Petitioner the contract on a take-it-or-leave-it basis via electronic iPad with no meaningful opportunity to review, under economic duress, far from home, late in the evening. Substantively, the contract permitted **Truist** to securitize and profit from Petitioner's note while imposing continuing obligations on Petitioner, to collect lender insurance proceeds upon default while still pursuing the full balance, and

permitted the **Dealership** to impose charges for warranty coverage already included in the CPO status.

168. Procedural unconscionability is further demonstrated by the contract's structure. The terms governing the security interest, finance charges, and payment obligations appear on pages three and four with no signature line, between two signed pages, and were incorporated by reference into the TILA disclosure without separate acknowledgment. The **Dealership's** sole signature is an illegible mark identified only as "BM," preventing verification of the signatory's authority. These features, combined with the iPad signing under time pressure, demonstrate that the contract was presented in a manner designed to prevent meaningful review. Neither the **Dealership** nor **Truist** provided value or consideration to Petitioner while receiving the full economic benefit of the transaction, rendering the exchange wholly one-sided and unconscionable.

169. WHEREFORE, Petitioner seeks a declaration that the unconscionable provisions are void and unenforceable, equitable reformation, restitution, and all other relief this Court deems just.

**COUNT XVIII — INVASION OF PRIVACY AND NEGLIGENT DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION (Against Truist) (Florida Common Law; 15 U.S.C. § 6801 et seq. as Standard of Care)**

170. Petitioner re-alleges paragraphs 31 through 37, 53 through 54, and 62 through 68 as if fully set forth herein.

171. Florida recognizes a common law right of privacy, the unwarranted invasion of which is actionable. Cason v. Baskin, 155 Fla. 198, 20 So. 2d 243 (1944). Florida further recognizes a cause of action for negligence where a defendant owes a duty of care to the plaintiff, breaches that duty, and proximately causes damages.

172. **Truist**, as a financial institution subject to 15 U.S.C. § 6801 et seq., owed Petitioner a duty to protect and safeguard Petitioner's nonpublic personal information, including account data, payment history, credit application data, and contact information. The Gramm-Leach-Bliley Act establishes the applicable standard of care for financial institutions handling consumer nonpublic personal information, including the obligation to provide a clear and conspicuous privacy notice at the time of establishing the customer relationship and to provide an opportunity to opt out of disclosure to nonaffiliated third parties before making any such disclosure. 15 U.S.C. §§ 6802(a) and (b).

173. **Truist** breached this duty by disclosing Petitioner's account data, payment history, and credit application data to securitization counterparties, trust investors, data processors, debt collectors, and consumer reporting agencies, each a nonaffiliated third party under 15 U.S.C. § 6809(b), without providing Petitioner the required privacy notice or opt-out opportunity before making any such disclosure.

174. **Truist** further invaded Petitioner's privacy by retaining and using Petitioner's personal contact information after repossessing and selling Petitioner's car and formally denying all of Petitioner's claims, and transmitting an unsolicited marketing communication to Petitioner on May 12, 2025 using that retained

information for commercial marketing purposes without Petitioner's consent. This unauthorized retention and use of Petitioner's nonpublic personal information after the termination of the consumer relationship constitutes an unwarranted invasion of Petitioner's privacy and an independent breach of **Truist's** duty of care.

175. As a direct and proximate result of **Truist's** unauthorized disclosure and use of Petitioner's nonpublic personal information, Petitioner suffered actual damages including emotional distress, reputational harm, loss of control over his personal financial information, and the transmission of his information to undisclosed third parties whose use of that information remains unknown to Petitioner.

176. WHEREFORE, Petitioner seeks compensatory damages for invasion of privacy and negligent disclosure of nonpublic personal information, punitive damages for **Truist's** willful disregard of its duty to protect Petitioner's personal information, injunctive relief prohibiting further unauthorized disclosure or use of Petitioner's nonpublic personal information, referral to the Federal Trade Commission for investigation of **Truist's** privacy practices, and all other relief this Court deems just and proper.

**COUNT XIX — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Against Truist) - (Florida Common Law)**

177. Petitioner re-alleges paragraphs 31 through 57 as if fully set forth herein.

178. Florida recognizes a common law cause of action for intentional infliction of emotional distress where the defendant's conduct is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. Metropolitan Life Insurance Co. v. McCarson, 467 So. 2d 277, 278-79 (Fla. 1985). The conduct need not be accompanied by physical harm; severe emotional distress caused by outrageous conduct is independently compensable.

179. **Truist's** conduct, viewed cumulatively as alleged above, directing the wrongful repossession of Petitioner's car on Mother's Day 2024 using a void Power of Attorney, ratifying the public characterization of Petitioner as a "Sovereign Citizen" during that repossession, refusing to validate the debt or account for Petitioner's tendered instruments, submitting repossession documentation through its agents BWA and Xtreme Towing that foreseeably resulted in FDHSMV retitling Petitioner's car into Truist's name without lawful authority, and sending the May 12, 2025 anniversary marketing email knowing Petitioner had been left without transportation for a year as a direct result of its own conduct, satisfies the standard for intentional infliction of emotional distress.

180. As a direct and proximate result of **Truist's** outrageous conduct, Petitioner suffered and continues to suffer severe emotional distress, humiliation, anxiety, loss of sleep, and psychological harm. These damages are compensable independent of all other claims alleged herein.

181. WHEREFORE, Petitioner seeks compensatory damages for severe emotional distress, punitive damages for the intentional and outrageous nature of **Truist's** conduct, and all other relief this Court deems just.

**EQUITABLE TOLLING (Applicable to All Respondents and All Counts) - (Equity; Florida Discovery Rule)**

182. Respondents' concealment of the true cost and terms of the transaction, the fraudulent nature of the Power of Attorney, the placement and collection of lender insurance proceeds, and the double recovery scheme prevented Petitioner from discovering the full extent of the fraud within any otherwise applicable limitations period. Petitioner exercised due diligence and discovered the scheme in 2024, from which date the discovery rule and equitable tolling apply to all claims subject to a limitations period. TILA's limitations period is subject to equitable tolling and the fraudulent concealment doctrine, such that the period does not commence until the borrower discovers or reasonably should have discovered the violation. Jones v. TransOhio Savings Ass'n, 747 F.2d 1037, 1043 (6th Cir. 1984). Petitioner requests that all applicable statutes of limitation be tolled to the date of discovery and that Petitioner be permitted to proceed on all claims notwithstanding any statutory time bars.

## VII. PRAYER FOR RELIEF

183. Prior to Respondents' conduct, Petitioner operated a thriving entrepreneurial business and maintained a credit profile sufficient to support business operations,

real estate investment activity, and personal financial stability. As a direct and proximate result of Respondents' collective conduct, including the wrongful collection actions, inaccurate credit reporting, unlawful repossession, and the resulting destruction of Petitioner's creditworthiness and business operations, Petitioner has suffered a complete collapse of his business income and financial standing.

184. Petitioner has been forced to rely on government assistance programs to meet basic living expenses, a circumstance directly and proximately caused by Respondents' unlawful conduct and one that would not have occurred but for that conduct. The loss of business income, the destruction of Petitioner's credit profile, and the resulting inability to access financing, enter into commercial transactions, or pursue the real estate investment and development activities that formed the foundation of Petitioner's livelihood represent the full measure of the economic harm Respondents have caused.

185. WHEREFORE, Petitioner respectfully demands judgment against all Respondents, jointly and severally, as follows. This Court is a court of equity as well as law. Petitioner asks this Court first to consider and award the equitable relief requested, which is primary, and thereafter to consider the legal and statutory relief, which is secondary and cumulative.

**A. EQUITABLE RELIEF**

186. Equitable rescission of the Retail Installment Sales Contract ab initio and restoration of both parties to their pre-contract positions, including return of all

sums paid, extinguishment of any remaining alleged obligation, and a declaration that the transaction was void from inception as fraudulently induced.

187. Specific performance requiring **Truist** to: (a) produce a full and complete accounting, ab initio, of all payments received, credits applied, insurance proceeds collected, securitization proceeds received, and any other financial benefit derived from Petitioner's instrument; (b) identify the true holder of the note and all parties in the chain of assignment; (c) prove the validity and amount of the alleged obligation; (d) produce all agreements, transfer documents, and servicing records related to Petitioner's account; and (e) produce all accounting records reflecting the ledger treatment of Petitioner's note at origination, including any cash outflow, purchase price paid to the **Dealership**, and recognition of the note as a loan receivable or purchased asset.

188. Imposition of a constructive trust over all profits, proceeds, servicing fees, gain-on-sale accounting, securitization proceeds, and insurance proceeds derived from Petitioner's transaction, with full disgorgement and restitution to Petitioner.

189. A full equitable accounting of all public-side and off-balance sheet transactions, ledgers, pooling and servicing agreements, trust agreements, assignment records, investor communications, insurance policies, and claims associated with Petitioner's Retail Installment Contract.

190. Injunctive relief prohibiting any further collection activity, reporting, or enforcement action on the alleged deficiency balance pending resolution of this action.

191. Injunctive relief prohibiting further use, disclosure, or reporting of Petitioner's personal or financial data without express written consent.

192. Release and cancellation of any alleged security interest, lien, or claim to Petitioner's car or personal property.

193. Monetary equivalent of replevin, being the fair market value of the 2019 Infiniti Q50 at the time of the wrongful taking, together with the value of all personal property detained and not returned.

**B. DECLARATORY RELIEF:**

194. A declaration that **Truist's** purported security interest never lawfully attached under Florida Statute § 679.2031 for failure of consideration and failure to give value directly to Petitioner.

195. A declaration that the Power of Attorney relied upon by **Truist, BWA,** the **Dealership**, **FDHSMV**, and **Xtreme Towing** is void ab initio for failure to comply with Florida Statute § 319.225(6) and Florida Statute § 709.2105(2).

196. A declaration that the title transfer by **FDHSMV** was unlawful and void.

197. A declaration that **Truist's** recoverable deficiency, if any, is limited under Florida Statute § 679.626(3) to the amount by which the obligation exceeds the greater of the actual sale proceeds or the proceeds that would have been realized in a commercially reasonable sale.

198. A declaration that **Truist's** conduct constituted misrepresentation, commercial dishonor, breach of the implied covenant of good faith and fair dealing, and fraud.

199. A declaration that any adverse tradeline, charge-off, or inquiry arising from the disputed obligation is void and must be permanently removed from Petitioner's consumer credit reports.

200. A declaration that any negative entry, charge-off designation, problem account notation, or adverse classification reported by **Truist** to ChexSystems, Early Warning Services, TeleCheck, or any other financial industry shared database in connection with the disputed obligation is void and must be permanently deleted.

**C. LEGAL RELIEF:**

201. Actual damages for economic loss, including the fair market value of the converted car, loss of payments made on a fraudulently induced transaction, out-of-pocket costs, severe emotional distress, and all other compensable injuries.

202. Statutory damages as authorized under the FDCPA, FCRA, TILA in recoupment, and FDUTPA.

203. Treble damages pursuant to RICO, 18 U.S.C. § 1964, and Florida Civil Theft, Fla. Stat. § 772.11.

204. Punitive damages sufficient to deter Truist's willful, malicious, and reckless misconduct in an amount to be determined at trial.

205. Disgorgement of all insurance premiums collected without proper licensing.

**D. ANCILLARY RELIEF:**

206. Attorneys' fees and costs of suit as authorized by the FDCPA, FCRA, FDUTPA, Florida Civil Theft statute, RICO, and any other applicable provision.

207. Pre- and post-judgment interest at the maximum lawful rate.

208. Permanent correction and deletion of all adverse credit tradelines and inquiries.

209. Permanent removal of Petitioner's name and account information from all financial industry blacklists and shared negative account databases to which **Truist** reported information related to the disputed obligation, including ChexSystems, Early Warning Services, TeleCheck, and LexisNexis, together with written confirmation of deletion.

210. Referral of this matter to the Consumer Financial Protection Bureau, the Federal Trade Commission, the Florida Attorney General, the North Carolina Attorney General, and the Georgia Attorney General for investigation of **Truist's** pattern of consumer harm.

211. Entry of permanent injunctive relief under 18 U.S.C. § 1964(a) prohibiting **Truist** from continuing the practices described herein against Florida consumers.

212. Such further relief, legal or equitable, that this tribunal deems just and proper.

Respectfully Submitted,

/s/ David Battle

David D. Battle, Jr.
855 Josephine Street
Brooksville, Florida 34601
Tel: 813-563-7090
Davidbattle1225@gmail.com

/s/ David Battle TTEE

David Battle, Trustee
Hong Sau Living Trust
855 Josephine Street
Brooksville, Florida 34601
Tel: 813-563-7090

Davidtrustee888@gmail.com
October 5, 2026

Petitioners, Pro Se

## CERTIFICATE OF SERVICE

I, David D. Battle, Jr., hereby certify that on October 5, 2026, a true and correct copy of the foregoing filing, was served upon each Respondent at the address listed below via U.S. Marshal, United States Certified Mail, First Class, postage prepaid, return receipt requested, or via the Court's CM/ECF electronic filing system where counsel has appeared.

1. TRUIST FINANCIAL CORPORATION d/b/a SunTrust
   214 North Tryon Street, Charlotte, North Carolina 28202
   Registered Agent Name & Address:
   David Jeckovich
   600 Brickell Avenue, Miami, FL 33131

2. INFINITI OF GWINNETT
   3090 Satellite Blvd, Duluth, Georgia 30096
   Registered Agent Name & Address:
   Justin Bishop
   7640 Roswell Road, Atlanta, GA, 30350, USA

3. BELL AND WILLIAMS ASSOCIATES, INC.
   7 Wall Street, Windham, New Hampshire 03087
   Registered Agent Name & Address:
   Ct Corporation System
   1200 South Pine Island Road, Plantation, FL 33324

4. JEFFERY FLETCHER
   13262 Spruce Grouse Ave, Brooksville, FL 34614

5. **XTREME TOWING** AND RECOVERY, LLC
   6252 Commercial Way Ste. 101, Weeki Wachee, FL 34613
   Registered Agent Name & Address:
   Fletcher, Jeff - 6252 Commercial Way Ste. 101, Weeki Wachee, FL 34613

6. FLORIDA DEPARTMENT OF HIGHWAY SAFETY AND MOTOR CARS
   Office of General Counsel
   2900 Apalachee Parkway, Tallahassee, Florida 32399

7. **EQUIFAX** INFORMATION SERVICES LLC
   1550 Peachtree St NW, Atlanta, GA 30309
   Registered Agent Name & Address:
   Corporation Service Company

1201 Hays Street Tallahassee, FL 32301-2525

8. **EXPERIAN** INFORMATION SOLUTIONS, INC.
475 Anton Boulevard, Costa Mesa, CA 92626
Registered Agent Name & Address:
Ct Corporation System
1200 South Pine Island Rd., Plantation, FL 33324

9. TRANS UNION LLC
555 West Adams Street, Chicago, IL 60661
Registered Agent Name & Address:
Corporation Service Company
1201 Hays Street Tallahassee, FL 32301

Respectfully Submitted,

/s/ David Battle

David D. Battle, Jr.
855 Josephine Street
Brooksville, Florida 34601
Tel: 813-563-7090
Davidbattle1225@gmail.com

/s/ David Battle TTEE

David Battle, Trustee
Hong Sau Living Trust
855 Josephine Street
Brooksville, Florida 34601
Tel: 813-563-7090
Davidtrustee888@gmail.com

Petitioners, Pro Se